PETER GREEN *v.* THE STATE.

1. MURDER — SELF-DEFENSE — CHARGE OF THE COURT.— If the slayer provoked the contest with the deceased with the apparent intention of killing him or doing him some serious bodily injury, he is guilty of murder, although he may have done the act of killing suddenly, *without deliberation, and in order to save his own life.* The law allows no justification in such a case, and no reduction of the grace of the homicide below that of murder. But if the slayer provoked the contest without any intention to kill or inflict serious bodily injury, and suddenly, without deliberation, did the act of killing, while the act would not be justifiable homicide, still it might be a lower grade of homicide than murder. See the opinion for the subject discussed, and for a charge on the subject *held* correct so far as it goes, but insufficient in not presenting the distinctions indicated.

.3. SAME — MANSLAUGHTER.— See the opinion *in extenso* for a state of facts in a murder trial which demanded a charge upon manslaughter.

APPEAL from the District Court of Walker. Tried below before the Hon. J. R. KENNARD.

The offense charged against the appellant was the murder of J. J. Elkins. Murder in the second degree was pronounced against him by the jury, and a term of ten years in the penitentiary was the punishment assessed.

The opinion discloses the entire case.

No brief for the appellant has reached the Reporters.

*H. M. Holmes*, for the State.

Willson, J.   The case as made out by the evidence is
as follows: On the 15th of January, 1880, in Walker
county, Texas, at McMillian's saloon, Peter Green, the
defendant, shot and killed J. J. Elkins.   A short time
before the killing, the defendant went into the saloon and
asked to have a five-dollar bill changed.   Elkins, who was
in the saloon, told Green he could change the bill if he,
Green, would pay him $2.50 of it on an old debt of $15
or $20 which he said Green owed him, and that if he,
Green, would let him have $2.50 of the money he, El-
kins, would square off with him on the old debt.   Green
consented to this, and Elkins kept the bill and handed
Green $2.50.   While this transaction was taking place,
Elkins cursed Green and called him a d—d son of a bitch,
etc.   Green left the saloon, saying to Elkins as he left
"that is all right, I will see you again, Mr. Elkins."   In
about ten minutes Green returned to the saloon, coming
in at the back door of an alley which led into the saloon.
Green stopped in the alley near the door of the saloon,
and was pulling paper from the wall and tearing it into
little pieces which the wind blew into the room where
Elkins was.   Elkins asked who that was in the alley.   A
person present told him it was Green.   Elkins called out
"Come in, Pete, I want to see you."   He called several
times, and Green replied "I don't want to see you," or
"I don't want to say anything to you."   Elkins replied,
"Well, I will come to you if you won't come to me," and
then walked towards Green.   Green turned and went
towards the back door, Elkins going after him.   Elkins
said "Stop, Pete, by G—d; I am not mad, I have nothing
against you," and Green replied, "You are a d—d liar."
Elkins answered "You are mad," and immediately the
shots were fired which killed Elkins.

There were four shots fired.   In regard to the position

of the parties at the time of the shooting there is a con-
flict of evidence. Rather, the first witness for the State,
and from whose testimony the above statements are ex-
tracted, states that both parties were inside the yard fence
at the time of the shooting, and that when the two last
shots were fired Elkins was returning to the saloon.
Several witnesses who saw the shooting testified that
Green was outside the fence when he fired each of the
four shots. The shots were fired very rapidly. One
witness who saw the shooting states that Green was
outside the gate and Elkins near the gate on the inside,
with his face towards Green, and with his hands down
by his side, and he was smiling at the time. At the third
shot he turned his face, and as he was in the act of turn-
ing the third shot was fired and he fell. The parties were
some ten feet apart, and witness was 30 or 40 steps
distant from them and in plain view of both of them.
When deceased fell he fell with his feet pointing in the
direction of the gate, and his face also fronting in that
direction. There were three wounds on the deceased, one
in the back or side of the head, one in an arm, and one in
the hip or just above the hip joint. The shooting was
done with a pistol. When Green left the saloon, after
his first meeting with deceased, he went to his wagon and
got something out of the wagon which he concealed
under his coat, and then went back to the saloon. There
was a pistol in the wagon which belonged to Green's
brother, and which Green knew was there. After the
fourth shot was fired by defendant he concealed his pistol
under his coat and ran off, and when captured soon after
he had no pistol about him.

It was proved on the part of the defendant that Elkins
was generally regarded as a dangerous man when drink-
ing, and that he was drinking on that occasion,— that he
was in the habit of carrying deadly weapons, and that on
that occasion he had in his left coat-pocket a deadly

weapon called a "billy" or "slung shot," and that his left hand was clasped upon this weapon inside his pocket when he was killed; that before the killing he had used very abusive and insulting language to defendant in the saloon, and that defendant seemed frightened and left the saloon in a hurry; that when deceased started after defendant to follow him down the alley, defendant rushed out of the gate in a great hurry. He cleared the gate about six feet and turned, and on a half-wheel began firing, and fired four shots with great rapidity. Defendant also proved by a witness that he had returned to the saloon after his first altercation with the deceased, for the purpose of speaking to witness about playing a game with cards which they had agreed to play together. The foregoing embraces about all the material facts in the case as we gather them from the record.

The court in its charge to the jury gave full, clear and correct instructions upon murder in the first and second degrees. The charge also contained instructions upon the law governing self-defense, but this portion of the charge of the court is objected to by counsel for defendant, and was excepted to at the time of the trial. That portion of the charge to which we now particularly give our attention, after stating the facts which would constitute self-defense, concludes with this proviso: "unless you shall believe beyond a reasonable doubt that the defendant had wilfully sought the difficulty or provoked the attack upon himself without just cause or provocation on his part; in which case you will find the defendant guilty of murder either in the first or second degree," etc. This same doctrine is embraced in two other charges given by the court to the jury; so that it was made quite prominent to the minds of the jury by being repeated to them in the charges no less than three times, as limiting and qualifying the right of self-defense. It is contended by the defendant's counsel that these charges are erroneous, 1st,

because the facts in the case do not justify them, and 2d, because they are not the law.

In the case of *Gilleland* v. *State*, 44 Texas, 356, it is said: "If the defendant voluntarily engages in a combat, knowing that it will or may result in death, or some serious bodily injury which may probably produce the death either of his adversary or himself, or by his own wrongful act brings about the necessity of taking the life of another to prevent being himself killed, he cannot say that such killing was in his necessary self-defense. But the killing will be imputed to malice, expressed or implied, by reason of the wrongful act which brought it about, or malice from which it was done." It seems to be well settled law that a person cannot get the benefit of the plea of self-defense if he sought the deceased with a view to provoke a difficulty or bring on a quarrel. (Harrigan & Thompson on Self-Defense, p. 220, note 1, and Neely's case, p. 102.) Article 602 of the Penal Code provides: "Though a homicide may take place under circumstances showing no deliberation, yet, if the person guilty thereof provoked a contest with the apparent intention of killing or doing serious bodily injury to the deceased, the offense does not come within the definition of manslaughter."

But suppose the contest was provoked without any *apparent intention of killing or doing serious bodily injury.* What then would be the legal effect of the provocation? Looking at the question as affected by this statutory provision, we believe the true doctrine to be this: 1st. If the slayer provoked a contest with the deceased, with the apparent intention of killing him or doing him some serious bodily injury, he is guilty of murder although he may have done the act of killing suddenly, without deliberation, and in order to save his own life. The law allows no justification in such a case, and no reduction of the grade of the homicide. 2d. But, if the slayer provoked the contest without any intentio

to kill or inflict serious bodily injury, and suddenly, without deliberation, did the act of killing, while the act would not be justifiable homicide, still it might be reduced to a lower grade of homicide than murder.

We think, therefore, that while the charge of the court which we have been discussing is correct as far as it goes, it should have gone further, and have drawn the distinction between that state of case where the contest was provoked by the slayer with the intent to kill or do serious bodily injury, and that other state of case where, although the contest was provoked, it was without an intention to kill or do serious bodily injury.

We think, further, in this case that the facts required of the court to charge the law of manslaughter. Manslaughter was explained in the charge only as a part of the explanation of murder, and the issue as to whether or not the homicide was manslaughter was withheld from the consideration of the jury. We think it was an issue fairly arising upon the evidence in the case, and that the defendant was entitled to have it submitted to the jury. There are other errors assigned in the case, but we deem it unnecessary to discuss them.

Because of the errors which we have noticed in the charge of the court, the judgment is reversed and the cause remanded.

*Reversed and remanded.*